[Civ. No. 17563. Second Dist., Div. Two. Aug. 1, 1950.]

WESTWOOD TEMPLE (a Corporation) et al., Respondents, v. EMANUEL CENTER (a Corporation), Appellant.

Harry G. Sadicoff and Henry S. Dottenheim for Appellant.

Zuckerman, Edmunds & Francis, Arthur E. Edmunds, Myron W. Curzon and Norman Pittluck for Respondents.

MOORE, P. J.—Appeal from a decree of specific performance of a written agreement made by an ecclesiastical body with its retiring rabbi. The contract was executed December 19, 1947. By its terms appellant agreed to convey five lots situate on Comstock Avenue in Westwood, a residential area of Los Angeles, as a consideration for the settlement of all controversies between the two factions in Emanuel and for the dismissal of a lawsuit which had been instituted by one Cytron and others in the superior court against appellant and certain of its members for a declaration of the rights of the parties. It was provided also that a nonprofit corporation should be organized on behalf of the rabbi and his adherents; that it should take title to the Comstock lots as soon as 150 members

of Emanuel had resigned and joined the ranks of the Westwood congregation.

In order to reconcile the factions of Emanuel and to effect a settlement of the Cytron case, the Community Relations Committee of the Los Angeles Jewish Community Council* participated in the conference of the Cytron litigants and their attorneys. Although a settlement was agreed upon and was embodied in the contract here involved appellant refused to perform. All efforts of respondents and the Community Relations Committee to induce performance having been rejected, this action was commenced and resulted in a judgment against Emanuel, whence this appeal.

As grounds for reversal appellant asserts:

(1) Respondents did not prove that the consideration for the contract was just and reasonable;

(2) The contract was illegal and void, having been made for the purpose of distributing a substantial portion of the assets of the corporation to a small minority of its members in an illegal manner;

(3) The court erred in excluding proof of the allegations of the "Amendment to the Answer" for the purpose of establishing that Emanuel held the Westwood property in trust for all members of the congregation.

## CONTRACT WAS JUST

█ The trial court found the contract to be just and reasonable; its purpose good; its means of adjusting the several involved controversies to be reasonable and appellant to have received adequate consideration for the property. Such finding being abundantly supported by substantial evidence cannot be upset except by a repudiation of long established usages in appellate procedure. (*Haddock* v. *Knapp*, 171 Cal. 59, 62 [151 P. 1140]; *Wilson* v. *White*, 161 Cal. 453, 465 [119 P. 895].) Conceding the property to be conveyed was worth $75,000, the rights surrendered by the rabbi were of no mean value. Their potential worth exceeded the last named sum. Had the plaintiffs prevailed in the Cytron case Mr. Trattner would have been made secure in his life tenure as rabbi of Emanuel at an annual salary of $15,000 with privileges that supplemented his income and opened a wider field for service.

---

*The council is composed of representatives of over 300 Jewish organizations—as an overall Jewish group to carry on certain activities for the general good of Los Angeles Jewry. It maintains as its public relations arm "The Community Relations Committee of the Los Angeles Jewish Community Council," referred to herein as CRC.

Also, he might have recovered by appropriate action the value of the slanderous utterances of his assailants. He would have been enabled to prosecute his spiritual and intellectual pursuits in peace and would have had to endure no more the taunts and resentments of his enemies at the altar. Even though the Cytron case was a representative suit instituted on behalf of Emanuel, none of the foregoing advantages to the rabbi would have been depreciated by reason thereof.

The necessity for an adequate consideration in a specific performance action does not mean that the value of the things to be given in exchange for the property to be conveyed must measure up to the appraisement placed upon them by the defendant. The doctrine merely requires that such consideration be just and fair under all the circumstances and that its sufficiency be addressed solely to the sound discretion and determination of the trial court and be supported by substantial evidence. (*Cushing* v. *Levi*, 117 Cal.App. 94, 102 [3 P.2d 958].) Its adequacy must be determined as of the date of the contract. (*O'Connell* v. *Lampe*, 206 Cal. 282, 285 [274 P. 336]; *Baran* v. *Goldberg*, 86 Cal.App.2d 506, 510 [194 P.2d 765].) Even the dismissal of the Cytron action was a compromise of the controversies between the rabbi and his followers on the one hand and Emanuel and the rabbi's adversaries on the other. Such settlement was a valid consideration for the contract. (*Rohrbacher* v. *Aitken*, 145 Cal. 485, 488 [78 P. 1054]; *Silver* v. *Shemanski*, 89 Cal.App.2d 520, 531 [201 P.2d 418]; *Hart* v. *Kanaye Nagasawa*, 218 Cal. 685, 695 [24 P.2d 815].) Moreover, the dismissal, though signed by its attorney, was the act of Emanuel (Code Civ. Proc., § 283) and is conclusive against collateral attack. (Code Civ. Proc., § 1908; *Woodward* v. *Superior Court*, 95 Cal. 272 [30 P. 535]; *Lieberman* v. *Superior Court*, 72 Cal. App. 18, 34 [236 P. 570].) But since appellant took over all the benefits awarded it by the contract it thereby waived all claims of their inadequacy. (*Peters* v. *Binnard*, 219 Cal. 141, 150 [25 P.2d 834].) Moreover, it has retained them all, made no offer to restore them to the rabbi and by reason of their nature restoration is impossible.

### MORE ABOUT THE CONSIDERATION

Temple Emanuel is a conspicuous center of Jewish worship in Beverly Hills on Wilshire Boulevard, the main thoroughfare leading westward from the heart of the city of Los Angeles. It was organized in 1939 by 25 families with Mr.

Trattner as its rabbi. He was then employed for the duration of his life to devote his entire time to the welfare of Emanuel to the exclusion of all other matters except literary, academic and lecture pursuits when not occupied with the labors of his pastorate. Such employment was pursuant to a section of Emanuel's by-laws which gave Trattner life tenure. Smooth sailing and pacific seas attended the course of the good ship Emanuel for about seven years. Then a tempest rose. Critics of the rabbi were emboldened to denounce him as not qualified. Discontent grew apace with the congregation which by 1947 was comprised of 650 families. The directors attempted to remove their pastor and the entire Jewish community of Los Angeles was disturbed. Some questioned the validity of the synagogue's agreements with their rabbi; some accused him of having accepted gifts from members, forbidden by his contract of employment; others challenged his authority and denied his right to act as Rabbi of Emanuel. Upon such issues the congregation became divided into hostile camps with his opponents bending every effort to discourage and discredit him. False charges were circulated against the rabbi by officers of the congregation to the pastor's detriment. They accused him of being insulting and domineering to some members; of having been gracious to those he thought wealthy; of having ignored those he thought poor; of having solicited members for gifts; of having fought a member; of having failed to perform his duty as rabbi; of having required some members to pay more dues than were required of others; of having caused 50 per cent of the members to resign. Some asserted that he had never been ordained pursuant to the canons of any branch of the Jewish faith. And for the purpose of effectuating their endeavors to remove him from his position at the head of the congregation in October, 1947, certain members employed private detectives to prevent the rabbi from attending the regular services and by physical force undertook to prevent him from entering the temple. Failing thus to bar his entrance, they changed the locks on the doors and thereby prevented his entering until interrupted by an order of court in the Cytron action.

Basing their complaint upon such words and acts of those who had participated in the opposition to the rabbi, one Samuel D. Cytron and five other members instituted their action in the superior court for a declaration of their rights in the premises. The settlement and compromise of that controversy formed the consideration for the contract here in suit. The Los Angeles

Jewish Community Council having attempted a mediation of the internecine strife, brought about a meeting of Emanuel's directors at which the president presided, a committee of the Community Council were present as well as Trattner and the lawyers of the litigants in the Cytron case. The purpose of the meeting was to effect a settlement of all controversies which had agitated the Jewish community of Los Angeles and which had culminated in the Cytron case to the dismay of Trattner's enemies. The contract was the fruitage of such conference. Those participating seemed to have striven with a unanimity to silence forever the hostile contest which had raged. In the course of the deliberations one of the CRC committee in an attempt to establish a basis for compromise asked the attorney for Emanuel whether the latter would give the temple to Trattner. The definite and emphatic negative was followed by an offer to give the Comstock lots to Trattner for the new synagogue and its communicants. Upon the acceptance of such offer, a resolution was unanimously adopted by the conference that (1) Emanuel keep the Wilshire synagogue; the Comstock lots be transferred to the Community Council to be by it conveyed to a nonprofit corporation to be used solely for religious purposes; (2) Trattner resign from Emanuel and release every conceivable claim against it and its members for libel and slander or for any other cause; (3) Emanuel's attorney prepare a draft of the contract with the assistance of Trattner's counsel, all points of disagreement to be referred to a committee of three specified members of the conference; (4) the completed draft be submitted to the directors of Emanuel for approval and authorization to execute the contract and any other documents necessary to "carry out the letter and spirit of the agreement."

The adoption of that resolution was the effectual settlement of all controversies. However, in the course of the preparation of the draft the parties agreed that as a condition precedent to the final transfer of the Comstock lots a minimum of 150 members of Emanuel must resign and join Westwood Temple prior to April 1, 1948. The filing of the articles of incorporation of Westwood Temple on December 30, 1947, had been preceded by the execution of the final draft of the contract by all the necessary officers, by Trattner and Westwood and by the attorneys of the parties. That ceremony was followed by the formal dismissal of the Cytron case. The CRC of the Community Council having certified that 150 members had

withdrawn from Emanuel and joined Westwood, respondents demanded conveyance of the Comstock lots. A deed was refused by Emanuel on the grounds that its officers were not authorized to execute the contract "as drafted" and it had never been approved by Emanuel's directors.

 Appellant contends that inasmuch as the Cytron case was a derivative suit, instituted by members of the Emanuel congregation against the corporation and divers directors and members thereof the filing of the dismissal of the action by the plaintiffs' attorneys was meaningless and constituted no consideration for the contract. The basic theory of such contention is that by virtue of its derivative nature the plaintiffs could not by their ex parte act effect a dismissal and a compromise of the action without the court's approval, citing *Whitten* v. *Dabney*, 171 Cal. 621, 630 [154 P. 312]; *Spellacy* v. *Superior Court*, 23 Cal.App.2d 142, 147 [72 P.2d 262]; *Russell* v. *Weyand*, 5 Cal.App.2d 259, 260 [42 P.2d 381]. Such argument appears for the first time on appeal and therefore is not entitled to consideration. However, in order that all claims may be disposed of, answer is now made to appellant's proposition. While it is true, as the last cited cases hold, that the plaintiff in a derivative suit on behalf of a corporation stands in the relation of a guardian *ad litem* and that a disposal of the action must be protected by the court's approval, there is no ground for complaint on that account. Pursuant to the order for dismissal signed by the attorneys of the parties, Judge Mosk ordered the dismissal. As a member of a three-judge court he had participated in the hearing of the application of Cytron for a receiver and was therefore cognizant of the significance of the issues and of the meaning of a dismissal of the action.

 The foregoing narrative should suffice to establish the adequacy of the consideration passing to Emanuel for a deed to the Comstock lots. It is manifest that from the recited facts appellant's advantages were enlarged by its undisturbed occupancy of Temple Emanuel. The happiness of its members has necessarily increased by a riddance of their chief annoyance. They are freed forever from his claims for damages and from the unsavory notoriety created by the prosecution of the Cytron action.

On the other hand, what did respondents under the contract receive for their releases and their dismissal of the Cytron case? By agreement duly authorized and executed they were

to get the Comstock property to be held in trust for religious uses. If used otherwise it must revert to Emanuel. The value of the lots so held was not by any means equivalent to the value of their unrestricted use. Their ownership and improvement of the lots by Westwood Temple is itself a benefit to every sincere follower of Israel for as a result of the conveyance a vacant property in one of the choicest communities on earth will be transformed into a center for Hebraic culture for the spread of rabbinical influences and for the extension of the morality and teachings of Moses and Elijah. The charters of both Emanuel and Westwood declare identical purposes.

The court below found on all issues as contended by respondents. Also, it determined that all the charges made by the members of Emanuel against the rabbi were false and slanderous. Such finding enhances the value of the concessions and releases made by the rabbi for the contract.

### THE CONTRACT IS NOT VOID

██ Appellant contends that the contract is void in that it was made for the purpose of distributing a substantial portion of Emanuel's assets to a small minority of its members in a manner forbidden by law. There is no basis, factual or legal, for such contention. A dissolution is not involved. The agreement to convey the Comstock lots is based upon a valid consideration advanced on behalf of an entirely separate corporate entity. In no sense is it a distribution of assets; hence neither section 9800* nor section 5000 of the Corporation Code is in point. Neither is section 824 of the same code applicable. That statute inhibits the distribution of its assets among its shareholders except as provided by law. The transfer to be made by appellant is not only for an adequate consideration but it is to go to another religious corporation to be used for the conduct of worship according to the Jewish faith and in harmony with the program of appellant. Thereby the transferor itself gained the advantage of converting its waste places into a center of light and learning. The case of *O'Dea* v. *Hollywood Cemetery Association*, 154 Cal. 53 [97 P. 1], is not pertinent. It involved an attempt to divide and distribute the corporate capital. Such act was forbidden by Civil Code, section 309.

---

*"A nonprofit corporation may dispose of all or substantially all of its assets, or may be wound up or dissolved, or both, in the same manner and with the same effect as a stock corporation, under the General Corporation Law."

## No Error in Excluding Proof of the Amendment to the Answer

After the trial had proceeded several days appellant offered an amendment to its answer for filing. The tardy pleading in substance alleged: defendant is a nonprofit corporation; it is not within its powers to enter into a contract to convey the Comstock lots; it purchased the lots for $73,750, paid it all except $45,000 which amount it requested its members and friends to pay so that appellant might build a synagogue wherein to engage in the ministration of Jewish rites and to teach the Jewish faith; to accomplish such purpose appellant established a "building fund" with which to pay the balance on the Comstock lots and erect an edifice; many persons paid money into the fund to be used as promised; a special bank account was opened for the purpose of receiving and holding the building fund to which was subscribed in excess of $50,000 and prior to December 18, 1947, the sum of $36,000 had been paid into the fund; such sum was used by defendant in paying the balance on the Comstock lots; the persons who subscribed to the building fund would not have done so except for the purposes announced by defendant; the money was subscribed and paid for the sole and exclusive purpose of clearing the Comstock property and erecting a building thereon and not for the purpose of obtaining a dismissal of the Cytron action or of settling any litigation against defendant; therefore the conveyance of such lots to Westwood would constitute a breach and violation of the purposes for which payments to the "building fund" were made.

The trial judge allowed the amendment to be filed solely "for the purpose of judicially acting upon it . . . of testing out its validity."

In the first place appellant by such a pleading attempted to intervene on behalf of other unnamed parties who evidently were not concerned about the disposition of the Comstock lots, or if so, cared too little to present their grievances. But, conceding the right of a defendant to file such a plea, the court was, under the circumstances disclosed, warranted in refusing a request to file it or in denying the offer of proof under it. The respondents had introduced their own evidence and rested and appellant had made progress in making its proof. To allow appellant under the circumstances to raise an utterly new issue such as that contained in its "amendment to the answer" could justifiably have been charged as an abuse of discretion.

The complaint was filed July 9, 1948, after appellant had provoked the action by a flagrant repudiation of its promises while holding on to the entire consideration it had received. It must be deemed already to have researched the problems to be presented by the threatened suit. The trial commenced on March 15, 1949, and the amendment was not offered until seven days had passed. No valid reason is proposed and none has been ascertained why appellant should have been so favored. Diligence is a duty of one who creates a controversy and readiness to go forward at all times is an indispensable virtue.

The allowance or rejection of an amendment offered in the midst of a trial is within the discretion of the trial court. Its ruling thereon will not be disturbed in the absence of a showing that the disallowance of the pleading thwarted justice. (*Neher* v. *Kauffman*, 197 Cal. 674, 686 [242 P. 713]; *Salmon* v. *Rathjens*, 152 Cal. 290, 296 [92 P. 733]; *Burr* v. *Pacific Indemnity Co.*, 56 Cal.App.2d 352, 360 [133 P.2d 24]; *Sullivan* v. *Richardson*, 119 Cal.App. 367, 370 [6 P.2d 567]; *Estate of Goldman*, 86 Cal.App. 125, 129 [260 P. 586]; *Johnson* v. *Johnson*, 134 Cal.App. 460, 461 [25 P.2d 538].)

### The Amendment Is Considered

There is nothing sacrosanct in the proposed amendment. It makes the archaic claim that Emanuel held the Comstock lots in trust for all the members of its congregation; that by virtue of the nature of an ecclesiastical corporation it is a trustee and each member is a beneficiary, citing *Wheelock* v. *First Presbyterian Church*, 119 Cal. 477, 483 [51 P. 841]; *Bomar* v. *Mount Olive M. B. Church*, 92 Cal.App. 618, 628 [268 P. 665]; *Baker* v. *Ducker*, 79 Cal. 365, 373 [21 P. 764]; *Los Angeles Holiness Band* v. *Spires*, 126 Cal. 541, 545 [58 P. 1049].) The cited authorities do not apply. They were all decided when former section 598, Civil Code, forbade a religious corporation to sell its property without first having obtained an order of court authorizing the sale. (*Giffen* v. *Christ's Church*, 48 Cal.App. 151, 154 [191 P. 718].) In 1931 the General Nonprofit Corporation Law was enacted providing that every corporation . . . may buy, sell, lease, mortgage and deal in real and personal property in the same manner that a natural person may. (See Civ. Code, §§ 593 and 597.) At the time of the Wheelock decision section 593 provided "for the administration of the temporalities and for the management of the property and estate of any church; any church may become an incorporation." The court held that

(p. 483) ''incorporation of religious bodies is only permitted as a convenience to assist in the conduct of the temporalities of the church.'' Such limitation upon the powers of the nonprofit corporation was removed by the corporation act of 1931.* Section 9501 of the Corporations Code (1947) authorizes every nonprofit corporation to ''convey, exchange, lease, mortgage, transfer upon trust or otherwise dispose of all property real or personal.'' That statute leaves no doubt of the power of a nonprofit corporation *to dispose of all real property* held in fee ownership.

■ Reverting now to appellant's contention made by the offer of the ''Amendment to the Answer,'' the facts otherwise developed show that the Comstock lots were purchased by Emanuel in February, 1946, the title taken in the name of one Gold. The sum of $28,750 was the down payment, and a trust deed secured Gold's note for $45,000. The latter transferred title to Emanuel which by monthly payments and a discount reduced the balance due to $40,000 in August, 1946. At that time certain members of the congregation borrowed $40,000 on their personal note and paid off the trust deed. A drive was then made for a building fund whereby $36,245 was collected. This was supplemented with sums taken from the Temple's general fund and thereby the personal note of $40,000 was liquidated. The only document signed by the contributors to the building fund contained their agreement to subscribe the designated sum and these words: ''in consideration of the subscription of others.'' In making its offer of proof of that writing and the names of the persons who subscribed, appellant's counsel stated that they ''were told that their money would be used in connection with'' the Comstock lots. Thus there was no proof made and none was offered that the Comstock lots were held on an express trust. No writing of Emanuel appears anywhere promising to hold the property in trust. No transfer was shown to have been made conveying it in trust. On the contrary the proof is clear that the lots were held in outright ownership by Emanuel which fact appellant had already admitted by its answer. As

---

*''The nonprofit corporation law as enacted in 1931 . . . extended and made more general the provisions for incorporation and increased flexibility of organization by optional provisions which were permitted to be included in the articles or in the by-laws. It provides that nonprofit corporations may amend their articles, sell their assets, and be dissolved or wound up in the same manner and with the same effect as stock corporations under the General Corporation Law. . .'' Ballantine & Sterling, California Corporation Laws, 1949 Ed., § 418.

proof that the lots were not held in a resulting trust they were purchased with Emanuel's money and subsequent contributors made unconditional gifts.

Judgment affirmed; also order denying motion to disallow costs affirmed.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied August 16, 1950, and appellant's petition for a hearing by the Supreme Court was denied September 25, 1950.